# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00470-CR

**Gary Hampton, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 003476, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

Appellant Gary Hampton appeals his conviction for indecency with a child by contact. *See* Tex. Pen. Code Ann. ' 21.11(a)(1) (West 2003).[1] The jury found appellant guilty and assessed his punishment at seven years=imprisonment but recommended probation. The trial court suspended the imposition of the sentence and placed appellant on probation subject to certain conditions.

### Points of Error

Appellant advances two points of error. He contends that there was a violation of (1) his federal and (2) state constitutional rights against self-incrimination when the trial court, over objection, permitted the State to cross-examine him before the jury on his post-arrest silence to law

---

[1] The current code is cited for convenience.

enforcement personnel. Appellant relies upon the Fifth and Fourteenth Amendments to the United States Constitution and article I, section ten of the Texas Constitution.

**Facts**

We will briefly discuss the facts to place the points of error in proper perspective. In February 2000, appellant lived in his rural Travis County home with his fiancée, Shelly Bland,[2] and her five-year-old son, Tyler. A few days before the date of the alleged offense, Shelly and her friend, Rebecca Brannon, left on a trip to Mexico. Appellant then received an invitation to join a group of friends at a party in the Warehouse District of Austin on Friday night, February 25. Appellant was caring for Tyler and knew that he had to find a babysitter. Appellant contacted Deidre Loftice, an acquaintance of his and Shelly=s, and a friend of Rebecca Brannon. Appellant understood Loftice had a daughter who was interested in babysitting. After several conversations, it was decided that Loftice=s twelve-year-old daughter, A.G., and her eleven-year-old friend, T.K., would babysit Tyler on Friday night. It was agreed that appellant would take the girls home the next day, or that Loftice, who had been invited to the party by appellant, could pick them up after the party.

Appellant was feeding Tyler supper when Loftice and the two girls arrived at appellant=s home on Friday evening. Loftice told appellant that she had other plans for the evening but she would call him later if she decided to join the party. Appellant then went to the party leaving the girls in charge of Tyler.

After they put Tyler to sleep in his room upstairs, A.G. testified that she and T.K. eventually went to bed in the downstairs bedroom. After 2:00 a.m. on Saturday morning, A.G. awoke and saw appellant standing in the doorway with Tyler. He said: ALook, there they are.

---

[2] By the time of the trial in March 2002, appellant and Shelly were married.

They=re sleeping. Don=t worry.@ Appellant and Tyler then left. A short time later, according to A.G., appellant returned to the bedroom, knelt by the bed, and began rubbing her leg with his hands. He eventually worked his hand into her shorts and fondled her vaginal area, her Aprivates.@ A.G. turned and twisted and then hit appellant with her shoulder while turning. At this point, appellant rose and left the room.

A.G. asked T.K. if she had seen what appellant did and T.K. acknowledged that she had seen appellant in the room. First, the girls hid in the closet. T.K. then went to the kitchen and got the cordless telephone. She called her father, Greg Keville, and told him that appellant had touched A.G. on her leg and they wanted to go home. Unable to reach Loftice by telephone, Keville drove to her house, where he found her asleep with his stepson, Jaome Brasher, Loftice=s live-in boyfriend. These three drove to appellant=s house and without disturbing appellant took the girls from the living room and left the house.

They stopped to discuss what action to take next. After discarding the suggestion of returning and beating up appellant, they telephoned the police. A sheriff=s deputy or deputies[3] arrived at the rural intersection where they were parked. Loftice testified that while the officer was there, A.G. told her that appellant had not only touched her leg but touched her vaginal area. A.G. testified that she told her mother this when they stopped at a convenience store on the way home. Loftice denied that they ever stopped at a convenience store.

---

[3] There was some testimony that there were two deputies. When Deputy Michael Villanueva testified, he did not indicate that he was accompanied by another officer.

T.K. confirmed that appellant first came with Tyler to the bedroom where she was asleep with A.G. in the early morning hours of February 26, 2000. T.K. stated that appellant later returned to the room, knelt beside the bed where A.G. was sleeping and clapped his hands together. She admitted that she could not see what appellant then did with his hands, but A.G. turned and twisted and nudged her.

After some inconsistencies, T.K. stated that when appellant left the room, A.G. reported to her that appellant Atouched her@ and Atouched her on the leg@, and that it was only later in the car that she heard A.G. tell her mother that appellant had touched her vaginal area.

Loftice testified that she brought the matter to Shelly Bland=s attention upon Shelly=s return from Mexico. Loftice stated that she had brought a civil suit against appellant seeking money damages. She added, AWhat I want is for him to get into trouble. That=s what I want to make sure of, but we haven=t derived [sic] at some dollar amount.@

Deputy sheriff Michael Villanueva testified that he responded to the call in the early morning hours of February 26, 2000. He talked with the adults or Aparents@ at a rural road intersection. He did not talk to the young girls. Villanueva cautioned the group not to return to appellant=s home. He informed the group that he would make a report to a detective, who in turn would contact them. Villanueva made no effort to contact appellant.

Detective Nancy Zimmerman of the Travis County Sheriff=s Office related that she made appointments for the girls at the Children=s Advocacy Center, took possession of videotapes made there, and took a statement from Loftice. Zimmerman did not testify that she contacted or attempted to contact appellant.

**4**

Appellant testified that he returned home in the early morning hours of February 26, 2000. He found A.G. and T.K. asleep in the downstairs bedroom. Appellant denied that he appeared with Tyler in that bedroom as described by A.G. and T.K. Appellant stated that he did observe that one of the girls was near the edge of the bed. He entered the room to push her to the middle so that she would not fall off the bed. As he did so, appellant reported that he stepped on something. He knelt down to see what it was and discovered a leaf from a flower arrangement in the room. He placed the leaf on a window sill. Appellant pushed the girl through the covers towards the middle of the bed. He went upstairs to check on Tyler and then went to bed. When appellant got up the next morning, he found that the girls had left. He discovered a recorded message on his telephone from T.K.=s mother that a family emergency had arisen and the girls had been taken home. Appellant denied the offense charged and denied that he was intoxicated.

There was no testimony concerning the circumstances surrounding appellant=s arrest. The record shows that an arrest warrant was issued on April 13, 2000, and on the same date, appellant executed a personal bond. The indictment was returned on May 31, 2000. At his March 2002 trial, appellant appeared with counsel and entered a plea of not guilty. This background becomes important in light of appellant=s post-arrest silence contentions and the State=s response on appeal that appellant was never arrested.

**The Alleged Error**

5

The points of error upon which appellant relies on appeal arose at trial. On direct examination, appellant stated that several days after Shelly returned from Mexico, she questioned him about the Saturday morning incident. Shelly had talked to Loftice. Appellant re-enacted for Shelly his actions that morning. The eucalyptus leaf upon which he had stepped was still in the window sill.[4] On cross-examination, the record reflects:

Q. Have you had any conversation with anyone else about this?

A. Yeah. I talked to a lot of people about this.

Thereafter, the prosecutor approached the bench and inquired of the trial court whether she could ask if appellant had ever given a statement to the police department. The trial court assumed that the State=s request was based on the answer to the question asked. Appellant objected on the basis of the AFifth Amendment.@ The trial court cautioned that the State would not be able to establish that appellant had earlier invoked his rights under the Fifth Amendment to the United States Constitution, but a question could be asked because appellant Aopened it up@ by the answer to the earlier question. Appellant=s counsel pointed out that it was the State=s question on cross-examination.

_____

[4] The leaf was introduced into evidence as defense exhibit number nine.

**6**

The prosecutor then inquired if she could ask if appellant Arefused@ to give a statement to the police. The trial court rejected that request because a refusal would be an invocation of appellant=s rights. The trial court stated that it would allow the first proposed inquiry. Appellant=s counsel objected that to indicate appellant did not give a statement to the police would infer refusal based on the Fifth Amendment and article I, section ten of the Texas Constitution. The objection was overruled.

Thereafter, in the presence of the jury, the prosecutor inquired:

Q. Mr. Hampton, did you ever give a statement or tell what you are telling us to Nancy Zimmerman or anyone with the Travis County Sheriff=s?

A. No, I did not.

## Preservation of Error

To preserve error for review, a party may make a timely, specific objection Aunless the specific grounds were apparent from the context.@ Tex. R. App. P. 33.1(a)(1)(A). Where the proper ground of exclusion was obvious to the trial court and opposing counsel, no waiver results from a general or imprecise objection. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). Moreover, when the trial court hears objections to offered evidence out of the presence of the jury and rules that such evidence is admitted, such objection shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections. Tex. R. Evid. 103(a)(1); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). We conclude that appellant preserved error for review. The State does not contend otherwise.

## Discussion

As a general rule, when an accused voluntarily takes the stand before a jury, he is subject to the same rules as any other witness in that he may be impeached, contradicted and cross-examined as to new matters. *Feldman v. State*, 71 S.W.3d 738, 755 (Tex. Crim. App. 2002); *Bryan v. State*, 837 S.W.2d 637, 643 (Tex. Crim. App. 1992); *Huffman v. State*, 746 S.W.2d 212, 219 (Tex. Crim. App. 1988); *Sanchez v. State*, 707 S.W.2d 575, 577 (Tex. Crim. App. 1986); *Brown v. State*, 617 S.W.2d 234, 236 (Tex. Crim. App. 1981); *Williams v. State*, 607 S.W.2d 577, 578 (Tex. Crim. App. 1980); *Brumfield v. State*, 445 S.W.2d 732, 735, 741-42 (Tex. Crim. App. 1969) (on State=s motion for reh=g). Where there are overriding constitutional or statutory prohibitions, however, the accused may not be treated as just another witness. *Alexander v. State*, 740 S.W.2d 749, 763 (Tex. Crim. App. 1987); *Sanchez*, 707 S.W.2d at 577; *Lopez v. State*, 990 S.W.2d 770, 777 (Tex. App.CAustin 1999, no pet.). One of the limitations on the prosecution=s cross-examination of an accused may be the constitutional privilege against self-incrimination. *Sanchez,* 707 S.W.2d at 582; *Raney v. State*, 958 S.W.2d 867, 876 (Tex. App.CWaco 1997), *pet. dism=d, improvidently granted*, 982 S.W.2d 429 (Tex. Crim. App. 1998). The privilege ceases only when liability to punishment no longer exists. *Bryan*, 837 S.W.2d at 643.

The use of a defendant=s post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right. *Dinkins v. State*, 894 S.W.2d 330, 556 (Tex. Crim. App. 1995).

In *Veteto v. State*, 8 S.W.3d 805 (Tex. App.CWaco 2000, pet. ref=d), the court wrote:

**8**

Under the U.S. Constitution, the State cannot use the post-arrest silence of an accused, after assurances such as *Miranda* warnings, to impeach an explanation subsequently offered at trial. *Doyle v. State [of Ohio]*, 426 U.S. 610, 618, 96 S. Ct. 2240, 2245, 49 L. Ed. 2d 91 (1976); *see also Greer v. Miller*, 483 U.S. 756, 763, 107 S. Ct. 3102, 3107, 97 L. Ed. 2d 618 (1987). After attempts by lower courts to broaden the language of *Doyle*, the Supreme Court reiterated its prohibition of the use of post-arrest, post-*Miranda* silence against the accused for impeachment purposes. *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 1312, 71 L. Ed. 2d 490 (1982). The decision was then left to the states to determine under their rules what was proper impeachment. *Id.*; *Sanchez v. State*, 707 S.W.2d 575, 578 (Tex. Crim. App. 1986). Based on two rationales, the Texas Court of Criminal Appeals determined that in addition to the *Doyle/Fletcher* prohibition, post-arrest, *pre-Miranda* silence also may not be used against an accused at trial. *Id.* First, the Court reasoned, the use would violate the accused=s right to be free from self incrimination under Article I, Section 10 of the Texas Constitution. *Id.* Second, the use would be improper impeachment under the evidentiary rules since, absent actual inconsistency, post-arrest silence is not probative as prior inconsistent conduct. *Id.* at 578, 582.

*Id.* at 810.[5]

In *Harris v. State*, 866 S.W.2d 316 (Tex. App.CSan Antonio 1993, pet. ref=d), the court

explained the development of the law since *Doyle* and *Sanchez* by stating:

In Texas, post-arrest silence may not be used against a defendant, even if he has not been warned pursuant to *Miranda*. *Sanchez v. State*, 707 S.W.2d 575, 580 (Tex. Crim. App. 1986); *see also Cuellar v. State*, 613 S.W.2d 494, 495 (Tex. Crim. App. [Panel Op.] 1981); *Womack v. State*, 834 S.W.2d 545, 546 (Tex. App.CHouston [14th Dist.] 1992, no pet.); *Juhasz v. State*, 827 S.W.2d 397, 405 n.3 (Tex. App.CCorpus Christi 1992, pet. ref=d). *Even when the defendant testifies, he may not be cross-examined about his post-arrest silence unless it is first established that he made a post-arrest inconsistent statement*. *Turner v. State*, 719 S.W.2d 190, 193 (Tex. Crim. App. 1986).

---

[5] The *Miranda* referred to is *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Id*. at 320 (emphasis added).

In *Turner*, 719 S.W.2d at 192-93, it was held error to permit the State to cross-examine a defendant regarding his post-arrest silence as to his alibi without first establishing that the defendant made an inconsistent statement during that time. In *Turner*, like the instant case, the prosecutor asked the defendant if he had told Aany law enforcement@ about his alibi. In *Sanchez*, 707 S.W.2d at 582, the court stated:

> Given the inherent ambiguity of post-arrest silence, such silence cannot be considered inconsistent with defensive matters later raised at trial. Absent a showing of actual inconsistency, post-arrest silence is not probative of prior inconsistent conduct; therefore, impeachment through the use of such evidence is improper.
>
> In *Bhakta v. State*, it was held that the prosecution may not use a defendant=s post-arrest

silence to impeach or discredit a defendant=s exculpatory theory, including a self-defense claim elicited for the first time at trial. 981 S.W.2d 293, 296 (Tex. App.CSan Antonio 1998, pet. ref=d) (citing *Dinkins*, 894 S.W.2d at 356). And in *Johnson v. State*, the prosecutor=s question to the defendant during cross-examination, asserting that the defendant did not tell the police that the murder victim came at him with a bottle, constituted an improper comment on the defendant=s post-arrest silence in violation of the state constitution. 83 S.W.3d 229, 231 (Tex. App.CWaco 2002, pet. ref=d).

In the instant case, there was no showing of a prior inconsistent statement or conduct on appellant=s part and appellant had not opened the door to the matter on direct examination. Yet, the State used his post-arrest silence against him to discredit and impeach him on cross-examination by demonstrating to the jury that he had never told the investigating officer or any sheriff=s deputy the exculpatory theory he related from the witness stand. This was a violation of appellant=s rights under the Texas Constitution. Tex. Const. article I, ' 10. Appellant=s counsel timely objected on this basis and preserved error. Tex. R. App. P. 33.1. *Bhakta*, 981 S.W.2d at 296.

The error discussed resulted in a violation of appellant=s state=s constitutional right against self-incrimination. We are required to reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a); *Dinkins*, 894 S.W.2d at 356. When reviewing the record for harm, we examine a number of factors**C**the source and nature of the error, the extent to which it was emphasized by the State, the weight a juror would probably place upon the error, and whether finding the error harmless would encourage the State to repeat it with impunity. *Dinkins*, 894 S.W.2d at 356 (citing *Harris v. State*, 790 S.W.2d 568, 597 (Tex. Crim. App. 1989)); *Veteto*, 8 S.W.3d at 813.

The source of the error was the prosecutor=s insistence on asking the improper question described. We have nothing in the record to explain why a prosecutor would depart from established rules and question appellant about his post-arrest silence. *See Johnson*, 83 S.W.3d at 232. There was a sharp conflict in the evidence as to the actual offense. Appellant=s exculpatory theory rested heavily upon his credibility and the State improperly impugned his trial explanation offered before the jury. Not satisfied with

**11**

that impeachment of appellant, the prosecutor sought to show on cross-examination of appellant=s wife, Shelly, that after she heard appellant=s version of the events in question, she failed to report that exculpatory version to the sheriff=s office.  The prosecutor further showed that in the deposition she gave in the civil lawsuit, Shelly failed to mention the eucalyptus leaf and stem that appellant claimed to have stepped on in the bedroom.[6]  Moreover, the thrust of the State=s jury argument was that based on the evidence, appellant=s exculpatory theory was a recent fabrication.

Credibility was a crucial issue for the jury.  After their deliberations began, the jury deadlocked on the issue of guilt or innocence and reported to the trial court that it could not reach a verdict.  The trial court gave an *Allen v. United States*, 164 U.S. 492, 501-02 (1896) or Adynamite@ charge to the jury before it reached a verdict.  To hold the instant post-arrest silence error harmless will only encourage prosecutors to repeat the constitutional error with impunity.  We are unable to conclude beyond a reasonable doubt that the error did not contribute to appellant=s conviction.  We sustain appellant=s second point of error.

The judgment of conviction is reversed and the cause is remanded to the trial court.

_____

[6] Shelly testified that she sought to supply the omission immediately after arriving home from the deposition.  This was later confirmed by her lawyer who testified concerning the correction.

**12**

John F. Onion, Jr., Justice

Before Justices Kidd, Patterson and Onion[*]

Reversed and Remanded

Filed:   May 8, 2003

Publish

[*]   Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov=t Code Ann. ' 74.003(b) (West 1998).

**13**